## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

APRIL BONVILLAIN,                 )

                              )

      Plaintiff,           )

                              )

        v.             )     Civil Action No. 1:18-cv-978 (TCB)

                              )

NANCY A. BERRYHILL,           )

                              )

      Defendant.         )

_____ )

## MEMORANDUM OPINION

Pursuant to the Social Security Act § 205(g), 42 U.S.C. § 405(g), April Bonvillain ("Plaintiff") seeks judicial review of the final decision of Nancy A. Berryhill ("Defendant"), the former Acting Commissioner of Social Security,[1] denying Plaintiff's claim for Supplemental Security Income ("SSI") pursuant to Title XVI of the Social Security Act. On June 4, 2018, the certified Administrative Record ("R.") was filed under seal, pursuant to Local Civil Rules 5(B) and 7(C)(1). By December 4, 2018, both parties filed motions for summary judgment with briefs in support, which are now ripe for resolution.[2] For the reasons set forth below, the undersigned U.S. Magistrate Judge, pursuant to 28 U.S.C. § 636(c)(1), will deny Plaintiff's Motion for

---

1. As of November 17, 2017, Defendant's status as Acting Commissioner of Social Security violated the Federal Vacancies Reform Act of 1988, which limits the time a position can be filled by an acting official. See U.S. Gov't Accountability Off., B-329853, Violation of the Time Limit Imposed by the Federal Vacancies Reform Act of 1998—Commissioner, Social Security Administration (Mar. 6, 2018). However, Defendant appears to continue to functionally lead the Social Security Administration ("SSA") and is the proper defendant in this case.

2. The motions and briefs in this case include Plaintiff's Motion for Summary Judgment (Dkt. 17) ("Pl.'s Mot. Summ. J."), Plaintiff's Brief in Support of Motion for Summary Judgment (Dkt. 18) ("Pl.'s Br. Supp."), Defendant's Cross-Motion for Summary Judgment (Dkt. 20) ("Def.'s Mot. Summ. J."), and the Memorandum of Law in Support of Defendant's Cross-Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment (Dkts. 21 & 22) ("Def.'s Mem. Supp. & Opp'n"), and Plaintiff's Reply to Defendant's Motion for Summary Judgment (Dkt. 24) ("Pl.'s Reply").

Summary Judgment (Dkt. 17), grant Defendant's Motion for Summary Judgment (Dkt. 20), and affirm the final decision of Defendant.

## I. PROCEDURAL BACKGROUND

Plaintiff filed the presently disputed application for SSI on September 26, 2014,[3] alleging disability with an alleged onset date ("AOD") of March 25, 2014. (R. at 182-87.) Plaintiff's claims were first denied on March 31, 2014, then again on reconsideration on September 15, 2014. (R. at 59-92.) On July 13, 2015, Plaintiff requested a hearing in front of an administrative law judge ("ALJ"). (R. at 110-12.) The hearing was held in front of ALJ Francine L. Applewhite on June 7, 2017, with Plaintiff being represented by a non-attorney representative, and during which the testimonies of Plaintiff and a vocational expert ("VE") were taken. (R. at 30-58.) The ALJ issued her decision denying Plaintiff's claims on August 4, 2017. (R. at 10-24.) On August 11, 2017, Plaintiff requested review of the ALJ's decision to the Appeals Council for the Office of Disability and Adjudication and Review ("Appeals Council"). (R. at 176-81.) The Appeals Council denied Plaintiff's request for review on June 6, 2018, making the ALJ's decision the final decision of Defendant. (R. at 1-6.) On August 8, 2018, Plaintiff filed her Complaint for judicial review of Defendant's decision (Dkt. 1). Defendant filed her timely answer on October 9, 2018 (Dkt. 9). By November 2, 2018, Plaintiff filed her Motion for Summary Judgment (Dkt. 17) and Defendant filed her Motion for Summary Judgment (Dkt. 20).

## II. STANDARD OF REVIEW

Under the Social Security Act, the Court's review of Defendant's final decision is limited to determining whether the ALJ's decision was supported by substantial evidence in the record

---

3. The record is not entirely clear regarding the correct application date. Plaintiff's application states that she applied for SSI on November 6, 2014. (R. at 182.) However, the ALJ and state medical examiners repeatedly state that Plaintiff filed her application on September 26, 2014. (R. at 13, 15, 59, 76, 77, 92.)

and whether the correct legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g); Bird v. Comm'r of Soc. Sec. Admin., 699 F.3d 337, 340 (4th Cir. 2012).

Substantial evidence has long been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). Put another way, substantial evidence is "more than a mere scintilla of evidence but may be less than a preponderance." Pearson v. Colvin, 810 F.3d 204, 207 (4th Cir. 2015). In reviewing for substantial evidence, the Court must examine the record as a whole, but it may not "undertake to re-weigh the conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). The Court must defer to Defendant's decision "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005). The correct law to be applied includes the Social Security Act, its implementing regulations, and controlling case law. See Coffman v. Bowen, 829 F.2d 514, 517-18 (4th Cir. 1987).

While the aforementioned standard of review is deferential, where the ALJ's determination is not supported by substantial evidence on the record, or where the ALJ has made an error of law, the district court must reverse the decision. See id. at 517. With this standard in mind, the Court evaluates the ALJ's findings and decision.

III. THE ALJ'S DECISION

An ALJ is required to employ a five-step sequential evaluation in every Social Security disability claim analysis to determine a claimant's eligibility. The Court examines this five-step process on appeal to determine whether the correct legal standards were applied in this case, and whether Defendant's resulting decision is supported by substantial evidence in the record. 20 C.F.R. §§ 404.1520, 416.920. In accordance with the five-step sequential analysis, the ALJ made

the following findings of fact and conclusions of law.

At step one of the sequential evaluation, the ALJ found that Plaintiff had not engaged in substantial gainful activity since Plaintiff's AOD of March 25, 2014. (R. at 15.) At step two of the sequential evaluation, the ALJ found Plaintiff's lumbar radiculopathy, bursitis of the left hip, carpal tunnel syndrome, and obesity to be severe medically determinable impairments. (R. at 15.) The ALJ determined that Plaintiff's other impairments—hypertension, anxiety, and fibromyalgia—were not severe as they were treatable without significant complication or stable with monitoring, and because the medical evidence did not support a finding of severe limitation. (R. at 15-17.) At step three of the sequential evaluation, the ALJ found Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 17.) In between steps three and four of the sequential evaluation, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 416.967(b), except Plaintiff could never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; and frequent bilateral handling, grasping or fingering. (R. at 18.) At step four of the sequential evaluation, the ALJ found Plaintiff's RFC did not preclude her from performing any of her past work. (R. at 22.) Nonetheless, the ALJ still made a step five determination and found that Plaintiff was able to perform jobs that existed in significant numbers in the national economy. (R. at 23-24.) Therefore, the ALJ concluded that Plaintiff was not under a disability, as defined by the Social Security Act, since September 26, 2014, the date the application was filed. (R. at 24.)

## IV. ANALYSIS

Plaintiff essentially raises three issues on appeal in support of her contention that

Defendant's final decision is unsupported by substantial evidence and erroneous as a matter of law. First, Plaintiff argues that the ALJ failed to properly evaluate the medical opinion evidence and did not afford appropriate weight to Plaintiff's treating and examining physicians. (Pl.'s Br. Supp. at 5-11.) Next, Plaintiff contends that the ALJ erred in finding that Plaintiff's impairments did not meet or equal Listing 1.04A. (Id. at 12-14.) Finally, Plaintiff argues that the ALJ failed to consider several of Plaintiff's medical impairments. (Id. at 14-16.) Each argument by Plaintiff is addressed in turn below.

## 1. Weight Given to Medical Opinion Evidence

Plaintiff contends that the ALJ improperly evaluated the findings of Dr. Lagatutta, Dr. Siekerkotte, and the state medical examiners. (Pl.'s Br. Supp. at 5-11.) Specifically, Plaintiff argues that the ALJ disregarded a great deal of evidence contained in those medical opinions and did not provide a proper explanation for why those opinions were being discredited. (Id.) In response, Defendant argues that substantial evidence supports the ALJ's decision to give the opinions of Dr. Siekerkotte, Dr. Lagutta, and state medical examiners partial or little weight. (Def.'s Mem. Supp. & Opp'n at 7.)

As Plaintiff recognizes, the question over the weight to be assigned to the medical opinions at issue speaks to the ultimate determination of Plaintiff's RFC. After step three of an ALJ's sequential analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC. 20 C.F.R. §§ 404.1520(e)-(f), 404.1545(a)(1), 416.902(e)-(f), 416.945(a)(1). Opinions by medical professionals, whether "acceptable medical sources" or "other sources," are one type of evidence that an ALJ is to consider in determining a claimant's RFC. Id. § 404.1527(b); SSR 06-03p, 2006 WL 2329939, at *4 (Aug. 9, 2006).

When the opinions by medical professionals are inconsistent with each other or with other

5

evidence, the ALJ must evaluate the opinions and assign them respective weight to properly analyze the evidence involved. 20 C.F.R. §§ 404.1527(c)(2)-(6), (d), 416.927(c)(2)-(6), (d); SSR 06-03p, 2006 WL 2329939, at *5. Only opinions from treating physicians may be given controlling weight. See 20 C.F.R. § 404.1527(c)(2). Generally, opinions from treating sources are given more weight than other opinions, and if it is found that a treating source's opinion on the nature and severity of a claimant's impairment is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record," it will be given "controlling weight." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Four requirements essentially exist for an opinion to be given controlling weight: (1) the opinion must come from a "treating source;" (2) the opinion must be a "medical opinion," defined as an opinion about the nature and severity of the claimant's impairments; (3) the opinion must be well-supported by medically acceptable clinical and laboratory diagnostic techniques; and (4) the opinion must not be inconsistent with the other substantial evidence in the record. S.S.R. 96-2p, 1996 WL 324188, at *2. If an opinion does not meet the aforementioned four requirements, it cannot be given controlling weight. Id.

If an opinion is not given controlling weight as a treating source's opinion, the Social Security regulations require that certain factors be considered to determine the weight given to the medical opinion. Those factors include: (1) examining relationship, (2) treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) any other factors that tend to support or contradict the medical opinion. 20 C.F.R. §§ 404.1527(c)(1)-(6), 416.927(c)(1)-(6); S.S.R. 96-2p, 1996 WL 324188, at *4. An ALJ is not required to explicitly analyze each of the aforementioned factors so long as the ALJ is clear as to which factor justified his or her conclusion. Bishop v. Comm'r of Soc. Sec., 583 F. App'x 65, 67 (4th Cir. 2014) (per curiam) ("While the ALJ did not

explicitly analyze each of the . . . factors on the record, the ALJ was clear that he concluded that the doctor's opinion was not consistent with the record or supported by the medical evidence, which are appropriate reasons."). Under the substantial evidence standard, "[a]n ALJ's determination as to the weight to be assigned to a medical opinion generally will not be disturbed absent some indication that the ALJ has dredged up specious inconsistencies, or has failed to give a sufficient reason for the weight afforded a particular opinion." Dunn v. Colvin, 607 F. App'x 264, 267 (4th Cir. 2015) (citations and quotations omitted).

Here, the ALJ gave Dr. Lagattuta's and Dr. Siekerkotte's opinions little weight. (R. at 21-22.) Additionally, the ALJ gave the state medical examiners' opinions only some weight. (R. at 22.) The Court addresses each evaluation in turn.

A. Dr. Lagutta

Dr. Lagutta, Plaintiff's treating physician, completed an RFC questionnaire on August 4, 2015. (R. at 431-34.) He noted that he had been treating Plaintiff on a monthly basis since May 4, 2015. (R. at 431.) Dr. Lagutta reported Plaintiff suffered from headaches, feeling light headed, night sweats, sleep disturbances and fatigue, and that she had constant pain, including pins and needles, which radiated to her legs and arms. (R. at 431.) He stated his objective findings were supported by conducting an EMG, x-ray, and MRI on Plaintiff. (R. at 431.)

Based on his observations, Dr. Lagutta opined that the severity of Plaintiff's pain and other symptoms would frequently interfere with the attention and concentration necessary to sustain simple, repetitive work tasks. (R. at 432.) Dr. Lagutta also determined that Plaintiff could not tolerate "low stress" work, though he did not explain the basis for such an extreme restriction. (R. at 432.) Dr. Lagutta then opined that Plaintiff could sit as well as stand for only one (1) hour at a time and thus was limited to less than two (2) hours of sitting, standing, walking in an eight (8)

hour workday and would need one unscheduled break every two hours. (R. at 432-33.) He also opined that Plaintiff could lift no more than ten (10) pounds and had limitations in doing repetitive reaching, handling or fingering. (R. at 433.) However, he did not explain whether the reaching, handling, or fingering limitations were mild, moderate, or severe but instead explained the limitations were due to Plaintiff's carpal tunnel syndrome. (R. at 433.) Finally, Dr. Lagutta explained that Plaintiff's limitations would result in good and bad days and would also cause Plaintiff to miss more than four (4) days of work per month. (R. at 434.)

The ALJ gave little weight to Dr. Lagutta's opinions. (R. at 22.) Although recognizing that Dr. Lagutta was Plaintiff's treating physician, the ALJ nonetheless chose to disregard Dr. Lagutta's medical opinions as his restrictive RFC was not supported by the longitudinal medical record. (R. at 22.) In the weight determination paragraph, the ALJ specifically found that (1) Dr. Lagutta's medical notes revealed no problems or complaints regarding Plaintiff's gait, (2) Plaintiff exhibited consistent strength in her back and hips, and (3) Plaintiff's pain could be managed through injections and prescriptions. (R. at 22.) In that same paragraph, the ALJ also noted that Plaintiff testified during the hearing that she managed her pain with Aleve (R. at 22, 41), and could perform daily activities such as driving and laundry (R. at 22, 37, 41-42). Finally, the ALJ found that Plaintiff's grip strength of "4+/5" was inconsistent with Dr. Lagutta's opinion that Plaintiff could rarely carry ten (10) pounds and occasionally less than ten pounds. (R. at 22, 412.)

In addition to those specific findings in the weight determination paragraph, the ALJ devoted several pages to discussing the objective medical evidence in the record. (R. at 19-21.) In this section of the decision, the ALJ found that Plaintiff's alleged difficulties arising from her lumbar radiculopathy were inconsistent with the objective medical evidence. The ALJ acknowledged that Plaintiff possessed nerve root inflammation and an injured disc in her lumbar

region, but determined that Plaintiff nonetheless demonstrated relative stability. (R. at 20, 458, 466.) In support of her findings, the ALJ directly cited to several portions of Plaintiff's medical records. (R. at 20.) For example, the ALJ pointed to Plaintiff's examination with Dr. Siekerkotte in which Dr. Siekerkotte reported that while Plaintiff could not stand on her toes, she could still stand on her heels. (R. at 411.) The ALJ also noted that in that same examination, Plaintiff's (1) range of motion for her lumbar region was 0-90 degrees for her flexion, 0-25 degrees for her extension, and 0-25 degrees for her lateral flexion bilaterally and (2) straight-leg test was negative bilaterally in a seated position. (R. at 411-12.) Further, the ALJ found that Plaintiff's multiple epidural injections, received in February 2016, provided Plaintiff with some manner of relief. (R. at 454.) While Plaintiff continued to feel pain, she nonetheless could continue to move. (R. at 441, 446, 451.) Moreover, Plaintiff's gait was described as "smooth" with an upright posture in March 2017, (R. at 498), and Plaintiff previously denied any problems walking (R. at 441). Furthermore, an independent review by the Court of Plaintiff's medical records establishes Plaintiff consistently denied any musculoskeletal weakness or instances of falling. (R. at 442, 446-47, 451-52, 457-58, 461-62, 465-66.)

The ALJ also found that Plaintiff's alleged difficulties caused by her left hip bursitis were inconsistent with the objective medical evidence. (R. at 20-21.) Plaintiff was definitely diagnosed with "trochanteric bursitis of the left hip" in May 2017. (R. at 506.) This matches the consultative examiner's notation that Plaintiff could not tolerate any range of motion testing on her left side during the examination. (R. at 411.) However, Plaintiff's past examinations "revealed consistent right and left hip flexion strength at 5/5, hip extension at 5/5, and hip abduction at 5/5 with a slightly reduced left hip abduction at 4/5." (R. at 20, 442, 446, 451.) Again, as previously noted, Plaintiff previously denied any difficulties with her gait and exhibited an upright posture. (R. at

441, 498.)

In addition to inconsistencies with the objective medical evidence, the ALJ noted inconsistencies with Plaintiff's subjective evidence. (R. at 19-20.) Plaintiff stated in January 2015 that she went grocery shopping, performed household chores, drove her kids to school, and went to physical therapy. (R. at 239, 240-42.) But in that same statement, Plaintiff claimed to no longer be able to sit, stand, or walk for extend periods of time. (R. at 238.) At the hearing before the ALJ, Plaintiff testified that she possessed a driver's license, drove around town, and continued to go to physical therapy. (R. at 37, 40.) Plaintiff's testimony also established that her pain medication relieved some of the pain. (R. at 41.) Finally, Plaintiff stated she could not, or at least struggled to, perform household chores such as laundry. (R. at 41-42, 46, 240.) However, when describing why she struggled to do the laundry, Plaintiff specifically mentioned the pain it caused in her back, not her hands. (R. at 42.) The ALJ found this particularly noteworthy given Plaintiff's statements and testimony describing her inability to hold a book, hold a pan, or use a computer. (R. at 19-20, 43-44, 242.)

Dr. Lagutta served as Plaintiff's treating physician. Therefore, the ALJ was required to give Dr. Lagutta's medical opinion controlling weight so long as it was well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the record. S.S.R. 96-2p, 1996 WL 324188, at *2; see also Thompson v. Astrue, 442 F. App'x 804, 808 (4th Cir. 2011) (per curiam) ("Under the 'treating physician rule,' a treating physician's opinion is given controlling weight if it is well-supported by medically acceptable clinical evidence and not inconsistent with other substantial evidence of record." (citing 20 C.F.R §§ 404.1527(d)(2), 416.927(d)(2); Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001))). "However, 'if a physician's opinion is not supported by clinical evidence or if it is inconsistent

with other substantial evidence, it should be accorded significantly less weight.'" Thompson, 442 F. App'x at 808 (quoting Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996)); see also Jacobs v. Berryhill, No. 2:16-cv-677, 2018 WL 658694, at *4 (E.D. Va. Jan. 31, 2018) ("If the ALJ finds the treating physician's opinion should not be entitled to controlling weight, he should not reject the opinion outright; rather, the ALJ should determine its appropriate weight, and explain the reasoning for doing so." (citations omitted)).

Here, the ALJ's decision to afford Dr. Lagutta's opinion little weight is appropriate. The ALJ recognized that Dr. Lagutta served as a treating physician and thus should normally be entitled to controlling weight. (R. at 22.) However, the ALJ decided not to afford the opinion controlling weight only after engaging in a thorough review of the evidence and providing specific rationale with citations to the evidence in the record. (R. at 19-22.) Further, the ALJ did not reject the opinion outright but instead gave Dr. Lagutta's opinion "little weight" and explained her rationale for doing so. Although Plaintiff may argue that the ALJ's rationale is not a "good" one, it is not the place of the Court to second-guess the ALJ's decision. The ALJ explicitly stated the weight she was giving Dr. Lagutta's opinion and explained her decision for doing so with citation to evidence in the record. While evidence in the record may also support Plaintiff's position, this Court cannot re-weigh evidence. See Apfel, 270 F.3d at 176. As a result, the Court finds the ALJ's decision was appropriate and not an error of law as it was supported by substantial evidence.

B. Dr. Siekerkotte

Dr. Siekerkotte examined and evaluated Plaintiff on February 4, 2015. (R. at 409-13.) Dr. Siekerkotte noted Plaintiff suffered from back pain, fibromyalgia, bilateral carpal tunnel syndrome, and de Quervain's tenosynovitis. (R. at 412.) The examination revealed that Plaintiff had difficulty standing on her heels and could not stand on her toes or left foot. (R. at 411.)

Relatedly, Dr. Siekerkotte found that Plaintiff's right hip side possessed limited range of motion and Plaintiff could not tolerate any range of motion testing on her left side. (R. at 411.) Additionally, Dr. Siekerkotte observed that Plaintiff had positive Tinel's and Phalen's signs, left-sided snuffbox tenderness, and left shoulder and lower back tenderness. (R. at 412.)

As a result, Dr. Siekerkotte opined that Plaintiff could only stand and walk for up to four (4) hours and sit for up to six (6) hours a day. (R. at 412.) Her opinion was based on Plaintiff's "difficulty with range of motion testing, deceased range of motion on the right, and inability to tolerate on the left lower extremity." (R. at 412.) Dr. Siekerkotte also opined that Plaintiff could lift and carry a maximum of ten (10) pounds both occasionally and frequently due to positive Tinel's and Phalen's, left-sided snuffbox tenderness, decreased grip strength bilaterally, and difficulty tolerating range of motion testing on lower extremities. (R. at 413.)

The ALJ gave little weight to Dr. Siekerkotte's opinions, finding them inconsistent with the findings of her examination of Plaintiff as well as the objective medical evidence in the record. (R. at 21.) Specifically, the ALJ noted that although Plaintiff's Tinel and Phalen tests were positive, there were no findings of wrist pain accompanying the tests and Plaintiff's "grip strength was near-perfect at 4+/5." (R. at 21.) Further, although Plaintiff's complaints and Dr. Siekerkotte's observations regarding Plaintiff's hips found some support in the record, the record did not support Dr. Siekerkotte's stand/walk and sit limitations. (R. at 21.) The ALJ found that Plaintiff's pain was managed via injections as well as prescription and non-prescription medications. (R. at 21.) Moreover, Plaintiff's gait was found to be smooth with an upright posture and Plaintiff previously denied any problems with her gait. (R. at 21.)

The ALJ was not required to give controlling weight to Dr. Siekerkotte's opinion because he served as a consultative examiner, not as Plaintiff's treating physician. See Cook v. Astrue, No.

2:10-cv-87, 2011 WL 719008, at *30 (N.D.W. Va. Jan. 28, 2011). Therefore, the ALJ only needed to consider Dr. Siekerkotte's opinion in light of the various factors outlined above. While the ALJ did not march through every specific factor, he did make it clear that he was assigning little weight to Dr. Siekerkotte's opinion because Dr. Siekerkotte's opinion was inconsistent with the longitudinal record as well as Dr. Siekerkotte's own findings. Bishop, 583 F. App'x at 67. Additionally, the ALJ specifically cited examples in the record, (R. at 21), and previously discussed Plaintiff's medical record in detail (R. at 19-21). Consequently, it is apparent that the ALJ took into account specific medical records when making her decision. See Coulbourne v. Colvin, No. 2:13-cv-97, 2014 WL 3904251, *13-14 (E.D. Va. Aug. 7, 2014) (holding that the ALJ's decision to afford less weight to Plaintiff's doctors was not conclusory despite the ALJ's lack of citation to medical evidence in the weight determination paragraph).

Moreover, as discussed in greater detail in the preceding section, a review of the record confirms that substantial evidence supports the ALJ's decision. For instance, Plaintiff possessed a normal gait as well as near-perfect strength grip strength. Further, the subjective evidence was inconsistent with Dr. Siekerkotte's opined limitations. Therefore, the ALJ's decision to afford Dr. Siekerkotte's opinion little weight and not include his proposed limitations in the RFC was appropriate.

C. State Medical Examiners

Plaintiff argues the ALJ erred in not including the state medical examiners' opined limitation that Plaintiff could only have occasional overhead reaching with the upper left extremity. (Pl.'s Br. Supp. at 11.) State medical examiners are highly qualified physicians who are experts in Social Security disability evaluation. 20 C.F.R. §§ 404.1513a(b)(1), 416.913a(b)(1). Therefore, when considering the opinion of a state medical examiner, the ALJ must evaluate those

findings just as he would for any other medical opinion. Id. §§ 404.1513a(b)(1), 416.913a(b)(1). The ALJ decided to give the state medical examiners' opinions only some weight, finding their proposed RFC was not sufficiently restrictive because their proposed RFC provided only for occasional stair and ramp climbing, stooping, crouching, crawling or kneeling. (R. at 22.) However, in the weight determination paragraph, the ALJ failed to address the state medical examiners' proposed upper left extremity limitation. (R. at 70, 87.)

The ALJ erred by not specifically addressing the overhead reaching limitation. The ALJ should have either included the state medical examiner's left extremity limitation in her RFC or disregarded it and provided an explanation for doing so. The ALJ did neither. Though, as discussed below, the ALJ's error was plainly harmless.

Although the determination of a claimant's RFC is reserved solely for the ALJ to make, the ALJ must nonetheless "explicitly indicate the weight given to all of the relevant evidence." Farnsworth v. Astrue, 604 F. Supp. 2d 828, 835-36 (N.D.W. Va. 2009) (citing Gordon v. Schweiker, 725 F.2d 231, 235 (4th Cir. 1984)). Further, "[i]n order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989) (internal citations omitted). An ALJ errs should he or she fail to include all of a claimant's impairments when questioning the VE. Id. at 50-51.

In a similar case to the one at present, the ALJ failed to adopt a limitation identified by two state agency experts despite stating that "he had 'essentially incorporated' the state agency experts' ascribed limitations in the plaintiff's residual functional capacity." Farnsworth, 605 F. Supp. 2d at 835. In that case, the ALJ failed to explain why he did not adopt the entirety of the state agency

experts' reports or why he specifically did not include the limitation at issue. Id. Further, the ALJ did not include the limitation in his hypothetical questions to the VE. Id. The district court held that even though the ALJ did not specifically address why he did not completely adopt the state agency experts' opinions, the ALJ nonetheless complied with Gordon by indicating the weight he was affording those opinions and thus did not err in that regard. Id. at 837. The district court did find, however, that the ALJ erred by not including the state agency experts' limitation in the RFC and in his hypothetical to the VE. Id. The Court in Farnsworth did not remand the case but instead found the ALJ's error was harmless as there was "no indication that the ALJ would have reached a different conclusion regarding the availability of jobs in the national and regional economies" even if the limitation had been included in the hypothetical given to the VE. Id.

The Court finds Farnsworth's rationale persuasive. In this case, the ALJ gave some weight to the state medical examiners' opinions and explained his reasons for doing so. However, the ALJ did not address the left extremity overhead reach limitation when discussing the weight afforded to the state medical examiners. As a result, the Court is left to assume that the ALJ adopted that limitation. Therefore, the ALJ complied with the command of Gordon, but the ALJ erred by not complying with Walker as she failed to include all of Plaintiff's impairments in her hypothetical to the VE.

Although the Court finds that the ALJ erred, it finds that the ALJ's error was harmless. Like in Farnsworth, and unlike in Walker, the ALJ did not ask the VE generalized questions. Instead, the ALJ proposed detailed hypotheticals to the VE, listing Plaintiff's various limitations. (R. at 51-53.) The ALJ's hypotheticals ensured that the VE knew Plaintiff's limitations and abilities. Contra. Walker, 889 F.2d at 51 ("In this case the ALJ did not ask questions that ensured that the vocational expert knew what the claimant's abilities and limitations were. Therefore, his

answers to those questions were not particularly useful."). Moreover, one of the ALJ's hypotheticals included an occasional overhead reach limitation:

> Q: If the hypothetical individual would have an additional limitation, so this building, occasional overhead reaching with the upper right extremity, could the hypothetical individual do the past work of cashier gambling?
>
> A: I believe so, Your Honor
>
> Q: Could the hypothetical individual do the other work of cashier II, sales attendant, or furniture rental clerk?
>
> A: Yes, Your Honor, I believe so.

(R. at 53.) [4] The ALJ's error was harmless because the VE identified four jobs existing in the national and regional economies that Plaintiff could still perform even with an occasional overhead reach limitation. Therefore, remand is not appropriate.

### 2. Evaluation of Plaintiff's Impairments Under Listing 1.04A

Plaintiff asserts that the ALJ failed to properly evaluate Plaintiff's impairments under Listing 1.04A. (Pl.'s Br. Supp. at 12-14.) Plaintiff argues that the ALJ merely recited the requirements of the listing and then concluded that Plaintiff did not meet those requirements without citation to medical evidence. (Id. at 12.) Specifically, Plaintiff contends that the ALJ ignored evidence in the record and made a conclusory determination that Plaintiff could in fact ambulate effectively as defined in the Social Security regulations. (Id.) Conversely, Defendant claims that the ALJ's step three analysis is supported by substantial evidence and that Plaintiff cannot satisfy Listing 1.04A's requirements. (Def.'s Mem. Supp. & Opp'n at 15-19.)

The Social Security Administration established the "listings" to define those circumstances in which impairments reach a level of severity that prevents any gainful activity, such that the

---

4. The ALJ may have proposed an upper right extremity limitation to the VE because Plaintiff's advocate at the hearing specifically asked Plaintiff about her right shoulder. (R. at 42.) Additionally, the state medical examiners also discussed an upper right extremity limitation. (R. at 71, 88.)

applicant is presumed disabled. Sullivan v. Zebley, 493 U.S. 521, 532 (1990). The listings serve as a regulatory device to "streamline[ ] the decision process by identifying those claimants whose medical impairments are so severe that it is likely they would be found disabled regardless of their vocational background." Bowen v. Yuckert, 482 U.S. 137, 153 (1987). Necessarily, the regulations establish more stringent criteria to meet the listings than is required to meet the statutory standard for disability. Zebley, 493 U.S. at 533. The claimant must "show that his impairment matches a listing," and that his condition "meet[s] *all* of the specified medical criteria." Id. at 530.

At step three of the sequential analysis, "the ALJ must clearly articulate the reasons for his decision regarding a listed impairment; a '[c]onclusory statement[ ] that a condition does not constitute the medical equivalent of a listed impairment [is] insufficient.'" Kiernan v. Astrue, No. 3:12-cv-459-HEH, 2013 WL 2323125, at *5 (E.D. Va. May 28, 2013) (alteration in original) (quoting Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009)); see also Cook v. Heckler, 783 F.2d 1168, 1173 (4th Cir. 1986) (requiring ALJ to identify listed impairments). "The ALJ must provide a 'discussion of the evidence' and an 'explanation of reasoning' for his conclusion sufficient to enable meaningful judicial review." Diaz, 577 F.3d at 504 (quoting Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 120 (3d Cir. 2000)). "Without such an explanation, it is simply impossible to tell whether there was substantial evidence to support the determination." Cook, 783 F.2d at 1173.

"In conducting his analysis, however, the ALJ need not use any particular 'magic' words or follow a 'particular format.'" Kiernan, 2013 WL 2323125, at *5 (quoting Cook, 783 F.2d at 1173). Furthermore, the ALJ "need only review medical evidence once in his decision." McCartney v. Apfel, 28 F. App'x 277, 279 (4th Cir. 2002) (per curiam). So long as the ALJ provides a discussion of the medical evidence at some point in his analysis, there is no requirement

that he repeat that discussion in his step three analysis. See Smith v. Astrue, 457 F. App'x 326, 328 (4th Cir. 2011) (per curiam) (citing Fisher–Ross v. Barnhart, 431 F.3d 729, 733–34 (10th Cir. 2005)).

In this case, at the beginning of his step three analysis, the ALJ stated that "[a]fter a thorough review of the evidence, I find no evidence to show the existence of any impairment that meets or medically equals the criteria of any of the listed impairments." (R. at 17.) The ALJ specifically noted that no treating or examining physician "mentioned findings equivalent in severity to the criteria of any listed impairment" and that the ALJ relied on the opinions of the state medical examiners in reaching his conclusion. (R. at 17.) The ALJ offered a limited analysis for why Plaintiff did not meet 1.04A's requirements. (R. at 17.) The ALJ only stated that: "the medical evidence does not establish the requisite evidence of nerve root compression, spinal arachnoiditis or lumbar spinal stenosis as required under listing 1.04. Moreover, there is no evidence that [Plaintiff's] back disorder has resulted in an inability to ambulate effectively, as defined in 1.00B2b." (R. at 17.) Although the ALJ provided a brief conclusion at step three, substantial evidence exists in the ALJ's opinion and in the record to support part of this particular finding.

In order to meet the requirements for Listing 1.04 an individual must satisfy several criteria. Specifically, Listing 1.04A provides that an individual must show:

> *Disorders of the spine* (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

20 C.F.R. pt. 404, subpt. P, app. 1 § 1.04.

As an initial matter, Plaintiff contends that the ALJ applied an improper legal standard. (Pl.'s Reply at 1.) Plaintiff argues that 1.04A does not require evidence of an inability to ambulate effectively. (Id.) Defendant, on the other hand, claims that Plaintiff must show an inability to ambulate. (Def.'s Mem. Supp. & Opp'n at 18.) In a recent decision, a court in this district directly addressed this issue, finding that "[i]t is axiomatic that ineffective ambulation is required to meet" Listing 1.04A's requirements. Unsworth v. Berryhill, No. 2:16-cv-00699, 2018 WL 773441, at *10 (E.D. Va. Jan. 16, 2018) (citing Vest v. Astrue, No. 5:11-cv-047, 2012 WL 4503180, at *4 (W.D. Va. Sept. 28, 2012)), report and recommendation adopted by 2018 WL 772087 (Feb. 7, 2018). Similarly, another district court in the Fourth Circuit noted that many, but not all, district courts in this Circuit had already found that Listing 1.04A did include an ineffective ambulation requirement. See Soles v. Colvin, No. 1:13-cv-491, 2015 WL 7454607, at *7 (M.D.N.C. Nov. 23, 2015) (collecting cases). Additionally, although the Fourth Circuit has not explicitly addressed this issue,[5] other circuits have, finding that Listing 1.04A does require evidence of inability to ambulate effectively. See Audler v. Astrue, 501 F.3d 446, 449 (5th Cir. 2007) (finding that all musculoskeletal impairments under Listing 1.00 require such proof); Leibig v. Barnhart, 243 F. App'x 699, 702 (3d Cir. 2007) ("[L]isting [1.04A] requires an inability to ambulate effectively or an inability to perform fine and gross movements effectively."). But see Burk v. Astrue, 493 F. App'x 913, 916 (10th Cir. 2012) (noting a claimant's inability to ambulate effectively "only pertains to" Listing 1.04C).

The regulation's language also appears to suggest that a demonstration of ineffective

---

5. In a recent Fourth Circuit decision, the court listed 1.04A's requirements and did not specifically include an inability to ambulate effectively. See Jones v. Berryhill, 681 F. App'x 252, 255 (4th Cir. 2017) (noting that 1.04C required evidence of an inability to ambulate effectively). Because the present issue was not before the Fourth Circuit in Jones, the Court declines to find that the Fourth Circuit has definitely spoken on whether 1.04A requires a showing of an inability to ambulate.

ambulation is required. Listing 1.00(B)(2)(a) states:

> *Regardless of the cause(s) of a musculoskeletal impairment*, functional loss for purposes of these listing is defined as the inability to ambulate effectively on a sustained basis for any reason, including pain associated with the underlying musculoskeletal impairment or the inability to perform fine and gross movements effectively on a sustained basis for any reason, including pain associated with the underlying musculoskeletal impairment.

20 C.F.R. pt. 404, subpt. P, app. 1 § 1.00(B)(2)(A) (emphasis added); see also Vest, 2012 WL 4503180, at *4 n.4 ("An impairment meets the requirement of a Listing when it satisfies all of the criteria of that Listing, including any relevant criteria in the introduction, and meets the duration requirement." (citing 20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3)). A fair reading leads to the conclusion that all subsections of Listing 1.00 require evidence of an inability to ambulate effectively. See Christopher v. SmithKline Beecham Corp., 567 U.S. 142, 155 (2012) (noting that deference should generally be given to an agency's interpretation of its own regulation unless that interpretation is "'plainly erroneous or inconsistent with the regulation,' or when there is reason to suspect that the agency's interpretation 'does not reflect the agency's fair and considered judgment on the matter in questions.'" (quoting Auer v. Robbins, 519 U.S. 452, 461-62 (1997))). Therefore, the Court will follow the majority of district courts in this Circuit and hold that Listing 1.04A requires a claimant to put forth evidence of an inability to ambulate effectively.

As used in this listing, the phrase "inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." 20 C.F.R. pt. 404, subpt. P, app. 1 § 1.00(B)(2)(b)(1). Further, "[i]neffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." Id. "To ambulate effectively," individuals must (1) "be capable of sustaining a

reasonable walking pace over a sufficient distance to be able to carry out activities of daily living;" and (2) "have the ability to travel without companion assistance to and from a place of employment or school." Id. § 1.00(B)(2)(b)(2). The regulations provide that non-exhaustive "examples of ineffective ambulation" include the inability to (1) "walk without the use of a walker, two crutches or two canes;" (2) "walk a block at a reasonable pace on rough or uneven surfaces;" (3) "use standard public transportation;" (4) "carry out routine ambulatory activities, such as shopping and banking;" and (5) "climb a few steps at a reasonable pace with the use of a single hand rail." Id. Finally, "[t]he ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation." Id.

As noted, the ALJ did not provide a detailed step three analysis. Nonetheless, the ALJ's determination is supported by substantial evidence discussed later in the decision. Specifically, as discussed previously, the ALJ subsequently addressed evidence that directly touched on Plaintiff's ability to ambulate effectively, including (1) Plaintiff's lack of complaints regarding her gait; (2) examinations revealing she had smooth gait with an "upright posture"; (3) relative stability her in hips and back; (4) consistent flexibility in her hips; (5) consistent strength in both hips; (6) effectiveness of medication to manage her pain; and (7) participation in physical therapy. (R. at 20-21.) Moreover, Plaintiff herself states that she is not contesting her ability to ambulate effectively. (Pl.'s Reply at 1.) By failing to demonstrate an inability to ambulate effectively, Plaintiff fails to meet her burden under Listing 1.04A. Therefore, the Court finds that the ALJ did not err at Step Three.

On a final note, the Court agrees with Plaintiff that, aside from the ambulation discussion, the ALJ's Step Three analysis is deficient. While the ALJ's statement that Plaintiff could ambulate effectively is supported by substantial evidence later in the decision, the same is not true of her

decision that the medical evidence did not support a finding of nerve root compression, spinal arachnoiditis or lumbar spinal stenosis. The lack of clarity from the ALJ frustrates meaningful review. The Fourth Circuit has been clear that an ALJ must provide a sufficient explanation of her findings to allow for meaningful appellate review, and that failure to do so is reversible error. See, e.g., Radford v. Colvin, 734 F.3d 288, 295 (4th Cir. 2013) ("A necessary predicate to engaging in substantial evidence review is a record of the basis for the ALJ's ruling. The record should include a discussion of which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence." (citations omitted)). The ALJ's lack of a discussion or explanation in this instance would normally frustrate appellate review and require a remand. See, e.g., Fox v. Colvin, 632 F. App'x 750, 755-56 (4th Cir. 2015) (per curiam); Radford, 734 F.3d at 296.

However, the Court finds that the ALJ's error in this instance was harmless because Plaintiff fails to show that she is unable to ambulate effectively. Therefore, vacating Defendant's decision and remanding the case would not alter the ultimate determination that Plaintiff does not satisfy all of Listing 1.04A's requirements. See Mickles v. Shalala, 29 F.3d 918, 921 (4th Cir. 1994).

### 3. ALJ's Failure to Consider Multiple Medically Determinable Impairments

Plaintiff argues the ALJ erred in failing to consider Plaintiff's neck impairment and De Quervain's tenosynovitis as medically determinable impairments. (Pl.'s Br. Supp. at 14-16.) Plaintiff contends that had the ALJ considered these impairments, the RFC "would have been drastically different, and more restrictive than it currently is now." (Id. at 16.) Defendant responds that the ALJ's failure to consider those impairments is harmless error as Plaintiff has not put forth any evidence establishing that those impairments cause any functional limitations not already

accounted for in the RFC. (Def.'s Mem. Supp. & Opp'n at 19-20.)

"At step two the ALJ must determine if the claimant has any severe impairment[s]." Jamison v. Bowen, 814 F.2d 585, 588 (11th Cir. 1987); see also Woodson v. Berryhill, No. 3:17-cv-347 (REP), 2018 WL 4659449, at *4 (E.D. Va. Aug. 7, 2018) ("An ALJ satisfies step two by finding a severe impairment and proceeding through the rest of the sequential analysis." (citations omitted)), report and recommendation adopted by 2018 WL 4658681 (E.D. Va. Sept. 27, 2018). Although the burden is on the claimant to show the existence of an impairment, Yuckert, 482 U.S. at 146, a claimant can satisfy that burden by establishing that an "abnormality's effect is not so minimal that it would not interfere with [a claimant's] ability to work irrespective of age, education, or work experience," Cantrell v. Bowen, 804 F.2d 1571, 1573 (11th Cir. 1986) (per curiam) (citation omitted). "While an ALJ does have a duty to develop the record, this duty is not never-ending and an ALJ is not required to disprove every possible impairment." McCoy v. Astrue, 648 F.3d 605, 612 (8th Cir. 2011) (citation omitted). As such, "an ALJ 'is not obliged to investigate a claim not presented at the time of the [benefits] application . . . and not offered at the hearing as a basis for disability.'" Meyer v. Colvin, 754 F.3d 251, 257 (4th Cir. 2014) (alterations in original) (quoting Halverson v. Astrue, 600 F.3d 922, 934 (8th Cir. 2010)); see also Leggett v. Chater, 67 F.3d 558, 566 (5th Cir. 1995) ("The ALJ's duty to investigate, though, does not extend to possible disabilities that are not alleged by the claimant or to those disabilities that are not clearly indicated on the record.")

"When assessing the claimant's RFC, the ALJ must examine 'all of [the claimant's] medically determinable impairments of which [the ALJ is] aware,' 'including those not labeled severe at step two.'" Lewis v. Berryhill, 858 F.3d 858, 862 (4th Cir. 2017) (first quoting 20 C.F.R. §§ 404.1525(a)(2), 416.925(a)(2); then quoting Mascio, 780 F.3d at 635). An ALJ must "consider

all [the claimant's] symptoms, including pain, and the extent to which [her] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." Id. (quoting 20 C.F.R. §§ 404.1529(a), 416.929(a)). "When the medical signs or laboratory findings show that [the claimant has] a medically determinable impairment(s) that could reasonably be expected to produce [her] symptoms, such as pain, [the ALJ] must then evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [her] symptoms limit [her] capacity for work." Id. (quoting 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1)).

An ALJ errs when he or she fails to evaluate a claimant's alleged impairment and make a threshold finding whether it is a medically determinable impairment. See, e.g., Berry v. Colvin, No. 5:16-cv-01500, 2016 WL 7741739, at *12 (S.D.W. Va. Dec. 22, 2016) (finding that the ALJ erred at step two "by failing to evaluate Claimant's allegation of fibromyalgia and decide whether it was a medically determinable impairment"), report and recommendation adopted by 2017 WL 127463 (S.D. W. Va. Jan. 12, 2017). However, an ALJ's failure "to list a specific impairment as severe in step two is harmless so long as the ALJ found other severe impairments." Shannon v. Berryhill, No. 1:17-cv-00066-RJC, 2018 WL 1567368, at *2 (W.D.N.C. Mar. 30, 2018); see also Pompa v. Comm'r of Soc. Sec., 73 F. App'x 801, 803 (6th Cir. 2003); Woodson, 2018 WL 4659449, at *4 (holding that an ALJ's "failure to address a medically determinable impairment at step two does not automatically require remand"). Courts typically treat the error as harmless "provided that the ALJ considered all of the claimant's impairments in the sequential analysis." Woodson, 2018 WL 4659449, at *4 (citations omitted).

A. de Quervain's Tenosynovitis

Here, the ALJ did not specifically mention de Quervain's tenosynovitis either at step two or later in her analysis. While Plaintiff did not specifically allege de Quervain's in her SSI

application, she did allege several problems with her hands in her application. (R. at 219.) Additionally, Plaintiff specifically mentioned and discussed de Quervain's during the hearing before the ALJ (R. at 43.) The medical evidence establishes that Plaintiff was diagnosed with de Quervain's on several occasions and by several different physicians. (R. at 412; 442, 447, 452, 470.) Clearly, Plaintiff's de Quervain's diagnosis qualifies as a medically determinable impairment. As a result, the ALJ should have included Plaintiff's de Quervain's as part of her step two evaluation even though Plaintiff did not specifically allege it in her application. Regardless, the question remains whether the ALJ's failure in this instance requires a remand.

While not specifically mentioning de Quervain's tenosynovitis, the ALJ did provide an analysis of Plaintiff's hand and wrist pain. (R. at 19-21.) The ALJ acknowledged and found that Plaintiff's carpal tunnel syndrome qualified as a severe impairment. (R. at 15.) Although the two conditions are distinct, de Quervain's, similar to carpal tunnel syndrome, affects the hand and wrist area. O'Neal v. Astrue, No. CV 310-055, 2011 WL 3951418, at *9 (S.D. Ga. Aug. 8, 2011). In evaluating Plaintiff's carpal tunnel syndrome, the ALJ noted that Plaintiff's January 2015 consultative examination revealed grip strength "was approaching 5/5 at '4+/5 bilaterally.'" (R. at 21.) That same exam revealed that:

> [Plaintiff's] wrist joints [had] 0-60 degree extension, 0-60 degree flexion, 0-20 degree radial deviation, and 0-30 ulnar deviation bilaterally. The thumb joints had an extension-flexion MCP of 0-70 degrees and IP of 0-90 degrees bilaterally. The fingers ha[d] an extension-flexion MCP of 0-90 degrees, PIP of 0-100 degrees and a DIP of 0-70 degrees bilaterally.

(R. at 21.) Additionally, the ALJ noted that Plaintiff's wrist pain was sufficiently managed by medication. (R. at 21.) In giving little weight to the opinions of Drs. Siekerkotte and Lagattuta, the ALJ noted that Plaintiff's grip strength was near perfect, Plaintiff did not mention any pain during the wrist flexibility test, and Plaintiff could get through the day by taking Aleve. (R. at 21-22.)

Moreover, the ALJ found that Plaintiff's subjective testimony and evidence was inconsistent. Specifically, with regard to Plaintiff's testimony regarding her hand pain, the ALJ found it "particularly noteworthy" that Plaintiff stated she could not perform chores, such as laundry, due to back pain rather than hand pain given her earlier testimony and statements that she could not hold a book, pan, or use a computer. (R. at 19-20.) Finally, the ALJ did include wrist and hand limitations in the RFC by limiting her to light exertional work with an additional restriction to only frequent bilateral handling, grasping, or fingering. (R. at 21.)

Plaintiff claims that the RFC would have been much more restrictive had the ALJ considered Plaintiff's de Quervain's as a medically determinable impairment. (Pl.'s Br. Supp. at 16.) The Court disagrees. In a similar case, a court found that an ALJ's failure to reference or evaluate plaintiff's de Quervain's impairment was harmless where the RFC already took into account the functional limitations caused by Plaintiff's carpal tunnel condition and shoulder and neck pain. O'Neal, 2011 WL 3951418, at *9. The Court similarly finds the ALJ committed a harmless error. The ALJ considered the impact of a similar condition with similar symptoms and having a similar effect on Plaintiff's ability to work. Even if the ALJ specifically referenced de Quervain's, the ALJ's decision would remain unchanged. The ALJ found that Plaintiff's near-perfect grip strength, ability to manage pain with medication, and her inconsistent subjective testimony counseled strongly against imposing any additional functional limitations. Plaintiff's argument is devoid of specifics and does not convince this Court that the mere mention of de Quervain's at step two or in the ALJ's RFC would alter the outcome.

B.  Neck Pain

The ALJ did not consider Plaintiff's neck pain. Plaintiff contends that error constitutes grounds for a remand. In contrast with her de Quervain's impairment, Plaintiff did not directly

allege any impairments or complaints regarding her neck in her application. (R. at 219.) Nonetheless, Plaintiff correctly notes that the medical evidence establishes that she was diagnosed with "[m]ild disc space narrowing at C5-6" in June 2011. (R. at 346.) In April 2014, Plaintiff reiterated complaints about neck pain, but her doctor informed her that "no cause for an MRI or Pain Management or Disability was found on CD of charts (190 pp)." (R. at 390.) However, the physician did invite Plaintiff to "search through CD and find reports showing need for above." (R. at 390.) Several months later, in September 2014, Plaintiff underwent another MRI, which revealed "mild reversal of the normal lordotic curvature" and "mild degenerative changes at the C4-C5 level." (R. at 423.) Moreover, Plaintiff's records from LAGS Spine and Sportscare BK in Bakersfield, California, consistently note complaints about neck pain and include a diagnosis of "C4 C5 Osteoarthritis." (R. at 440, 442, 445, 447, 450, 456, 460, 464, 468, 473.) Plaintiff's neck pain plainly qualifies as a medically determinable impairment.

As noted above, courts often find an ALJ's failure to mention an impairment to be harmless so long as the ALJ discusses that impairment later on in the sequential analysis. See Woodson, 2018 WL 4659449, at *4 ("While the Fourth Circuit has not addressed the precise issue, district courts in this Circuit have adopted the view that an ALJ does not commit reversible error by omitting an impairment at step two, so long as the ALJ considers the impairment in subsequent steps." (citations omitted)). For example, in Woodson, the ALJ did not discuss Plaintiff's alleged cervical spinal stenosis, cervical myelomalacia and cervical myelopathy at Step Two. Id. at *5. However, the court there found that the ALJ did not commit reversible error because the ALJ "adequately discussed those impairments in the RFC assessment." Id. Furthermore, in some instances, courts refuse to remand even when an ALJ failed to consider a potential impairment at any point in the analysis. See, e.g., Burton v. Berryhill, No. CBD 17-3681, 2018 WL 5312162, at

*4 (D. Md. Oct. 26, 2018) (finding no error where the ALJ did not consider several of plaintiff's diagnoses as the "record reveal[ed] only brief references" to those diagnoses and because "the ALJ is under no obligation to consider every single condition a claimant may have"). For example, in Stewart v. Colvin, the Court found that the ALJ, at most, only committed harmless error where the ALJ did not consider plaintiff's allegations of anxiety and depression. No. 5:14-CV-601-FL, 2016 WL 320299, at *8 (E.D.N.C. Jan. 7, 2016). In reaching its decision, the court relied on the facts that plaintiff (1) was successfully treated with medication for anxiety and depressive symptoms, (2) expressed "no further complaints of such," (3) provided no records establishing she sought treatment from a mental health provider, and (4) failed to demonstrate that her anxiety and depression resulted in any functional limitations. Id.

The present issue does not fit neatly into either one of those scenarios. This is not an instance where the ALJ merely forgot to mention an impairment at Step Two but later discussed it as part of the RFC analysis. The ALJ does not reference or discuss Plaintiff's next pain at all in the decision. Moreover, unlike in Stewart or Burton, Plaintiff's medical records are replete with neck pain complaints and MRIs as well as a definite diagnosis. Additionally, although Plaintiff did not allege neck pain in her application, one of the state medical examiners specifically discussed Plaintiff's neck pain complaints. (R. at 67.) See Leggett, 67 F.3d at 566 (suggesting ALJ's duty to investigate extends to possible disabilities that are clearly indicated on the record); Berry, 2016 WL 7741739, at *12 ("Given Claimant's diagnosis of fibromyalgia and her years of treatment by a rheumatologist, the ALJ should have made a threshold finding regarding whether Claimant had a medically determinable impairment of fibromyalgia." (citation omitted)). While an ALJ's duty to develop the record is not never-ending, it appears patently obvious that the ALJ should have considered Plaintiff's neck impairment.

Though recognizing the ALJ's failure in this regard, the Court will not order a remand. Plaintiff puts forth no evidence from the record to indicate that the ALJ's consideration of her neck pain would potentially alter the RFC formulation in any meaningful way. To support her argument for remand, Plaintiff references Dr. Siekerkotte's proposed RFC that "precluded [Plaintiff] from climbing ladders, ropes, and scaffolds and from crawling." (Pl.'s Br. Supp. at 16.) But the current RFC already precludes Plaintiff from climbing ladders, ropes, or scaffolds and limits her to only occasional stooping, crouching, crawling, or kneeling. (R. at 18.) Accordingly, Dr. Siekerkotte's proposed RFC, in this regard, is only slightly more restrictive than the ALJ's RFC. However, as Defendant correctly notes, Plaintiff's past relevant work as a cashier-gambling does not involve crawling at all. (Def.'s Mem. Supp. & Opp'n at 20.) Plaintiff also fails to show how her neck pain produces any additional, relevant limitations not already accounted for by the ALJ. See Lehman v. Astrue, 931 F. Supp. 2d 682, 693 (D. Md. 2013) (finding harmless error where ALJ failed to consider plaintiff's obesity impairment because, in part, plaintiff "failed to demonstrate how obesity affects his ability to function"). Therefore, the ALJ's RFC properly accounted for any functional limitations imposed by Plaintiff's neck pain.

Given the foregoing circumstances, the Court will decline to remand based on the ALJ's failure to consider Plaintiff's neck impairment. See Morgan v. Barnhart, 142 F. App'x 716, 723 & n.6 (4th Cir. 2005) (applying harmless error standard in Social Security appeal); Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a [Social Security] case in quest of a perfect opinion [from an ALJ] unless there is reason to believe that the remand might lead to a different result.").

## V. CONCLUSION

Upon review of the filings and the entire record, the Court finds that Plaintiff's Motion for Summary Judgment (Dkt. 17) should be denied, Defendant's Motion for Summary Judgment (Dkt. 20) should be granted, and the final decision of Defendant should be affirmed. A separate order will follow.

/s/
Theresa Carroll Buchanan
United States Magistrate Judge

THERESA CARROLL BUCHANAN
UNITED STATES MAGISTRATE JUDGE

March 15, 2019
Alexandria, Virginia